**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE BAER

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JEFFERY STEVEN STONE; JANETTE DILLER
STONE; CRESCENT FUND, LLC;  PEDRACAR,
INC.; WEBSKY, INC.; and DOUGLAS HAFFER,

Defendants.

06 CV 6258

06 Civ. _____

**COMPLAINT**
(Securities Fraud)

RECEIVED
AUG 17 2006
U.S.D.C. S.D. N.Y.
CASHIERS

The United States Securities and Exchange Commission ("Commission" or the "SEC")
alleges for its Complaint as follows:

**SUMMARY**

1.      Jeffery Steven Stone, a recidivist securities law violator, and his wife, Janette
Diller Stone, conducted a market manipulation scheme involving the securities of WebSky, Inc.
Stone and Diller accomplished the manipulative scheme by purchasing nearly 288 million
WebSky shares under false pretenses, obtaining control of the public float and disseminating
false public information touting WebSky, all with the ultimate goal of dumping inflated WebSky
stock on unsuspecting public investors and profiting at their expense.

2.      As part of their scheme to manipulate the market for WebSky securities, Stone and
Diller orchestrated a massive spam email campaign that falsely portrayed WebSky as having a
successful joint venture in Argentina that would result in over $40 million in annual revenues.
WebSky's CEO, however, had forbidden Stone and Diller from sending the spam email and
specifically advised them that, contrary to the email's representations, the Argentina project was
no longer viable.  Stone and Diller nevertheless conducted the spam email campaign and
obtained proceeds of over $500,000 from sales made during the campaign.

3.      When they sold the 288 million shares, WebSky and its CEO, Douglas Haffer, did not know of Stone and Diller's fraudulent scheme.  WebSky and Haffer were never informed by Stone and Diller that, in contravention of Haffer's instructions, Stone and Diller had conducted a spam email campaign.  In August 2005, WebSky and Haffer sold WebSky securities to another Diller-controlled entity for which transaction no registration statement was filed and no exemption was perfected.

4.      Through this action, the Commission seeks the return from defendants of benefits they obtained from violations of the federal securities laws, civil penalties for those violations and an injunction against all defendants prohibiting future violations of the securities laws.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

6.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78aa].

7.      This Court is a proper venue for this action because acts, transactions, practices and courses of business constituting the violations alleged in this Complaint occurred within this District.

8.      In connection with the conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business.

## DEFENDANTS

9.     **Jeffery Steven Stone** ("Stone"), age 42, resides in New York, New York and Greenwich, Connecticut.  Stone promotes stocks, primarily stocks priced below five dollars ("penny stocks"), for compensation.  In 1999, Stone pleaded guilty to wire fraud and conspiracy to commit wire fraud and commercial bribery for participating in a market manipulation scheme.  Stone was sentenced to three years in prison and was ordered to pay a fine of $50,000.  In a parallel civil action by the Commission, Stone was permanently enjoined from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  In connection with that injunction, the court also barred Stone from participating in any offering of a penny stock.  On August 5, 2004, in an administrative proceeding, the Commission barred Stone from associating with any broker or dealer without Commission approval.  In re Richard Wolff, Alex Grinshpon, Alex Solon and Jeffery Stone, A.P. File No. 3-11507, 2004 SEC LEXIS 1713 (Aug. 5, 2004).  Stone has not sought authorization from the Commission to operate as or associate with a broker or dealer.

10.     **Janette Diller Stone** (formerly Janette Diller) ("Diller"), age 41, resides in Greenwich, Connecticut.  Diller promotes stocks, primarily penny stocks, for compensation. Stone and Diller are currently married.

11.     **Crescent Fund, LLC** ("Crescent Fund") is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Crescent Fund is engaged in the business of stock promotion for compensation.  Stone and Diller are managing members, officers and controlling persons of Crescent Fund.

12.     **Pedracar, Inc.** ("Pedracar") is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in New York, New York.  Diller is an officer and controlling person of Pedracar.

13.     **Douglas Haffer** ("Haffer"), age 58, resides in Oakland, California.

14.     **WebSky, Inc.** ("WebSky") is a corporation organized under the laws of the State of California with its principal place of business in San Francisco, California. Haffer is the President, CEO, Chairman and a controlling person of WebSky. During the relevant time period, WebSky earned no revenues or profits. WebSky has never filed a registration statement with the Commission. In 2004, WebSky stock was quoted in the electronic quotation service operated by the Pink Sheets, LLC. The shares of WebSky are securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)]. WebSky stock is a "penny stock," as defined by Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

## FACTUAL ALLEGATIONS

### The Scheme to Manipulate WebSky Stock

15.     In or about September 2004, defendants Stone, Diller and Crescent Fund agreed, expressly or by conduct, to increase the sales volume and price of WebSky stock by fraudulently creating demand for the stock through artifice. They accomplished this by purchasing approximately 288 million WebSky shares from WebSky under false pretenses, thereby obtaining control of the public float, and disseminating false public information touting WebSky.

16.     On or about September 20, 2004, Pedracar – an entity controlled by Diller – agreed to purchase 287,700,000 WebSky shares from WebSky for $719,250. Diller, as the President of Pedracar, signed a subscription agreement (the "Subscription Agreement") for the purchase.

17.     In the Subscription Agreement, Diller falsely represented to WebSky that (1) Pedracar was an accredited investor under Rule 501 of Regulation D of the Securities Act; (2) Pedracar was acquiring the shares for its own account and not on behalf of any other; (3) Pedracar was not acquiring the shares with a view to distributing them; and (4) Pedracar and its

officers would not engage in any trading practices in violation of any Commission rule. Diller also repeatedly misled WebSky's President and CEO, Haffer, by telling him that Pedracar had no intention of selling the WebSky shares.

18.     All of these statements were false. In particular, when Diller signed the Subscription Agreement, Pedracar was not acquiring the shares for its own account, and Stone and Diller fully intended to distribute them, even though the federal securities laws barred them from doing so without registering the transaction or perfecting an exemption. Based on these false representations, WebSky delivered the 287,700,000 shares to Diller and Pedracar. The shares represented almost 40% of WebSky's outstanding shares and approximately 85% of the public float.

19.     Three days after entering into the Subscription Agreement, Stone and Diller took steps to distribute the shares. On September 23, 2004, Stone, the Managing Director of Crescent Fund, called a third party investment manager and offered to sell him WebSky shares from Pedracar, which Stone represented to be an unaffiliated third party. Pursuant to a written agreement dated September 29, 2004, the investment manager purchased 14.5 million WebSky shares from Pedracar for $100,000. Stone negotiated the agreement with the investment manager. Diller, who is the President of Crescent Fund, authorized the transfer of the WebSky securities from Pedracar's brokerage account.

20.     In addition to selling shares to the investment manager, Stone arranged and negotiated sales of WebSky shares held by Crescent Fund and Pedracar to at least three other third parties. In total, by January 2005, Pedracar and Crescent Fund had sold over 101 million WebSky shares for $365,000 in proceeds to third parties. Based on the price set in the Subscription Agreement, Pedracar and Crescent Fund paid WebSky $254,145 for those shares, resulting in a profit of $110,855.

21.     Beginning in late December 2004 and continuing through February 2005, Pedracar and Crescent Fund also began selling WebSky shares directly into the open market.

22.     As part of their manipulation scheme, shortly after acquiring the WebSky shares, Diller and Stone began promoting WebSky's prospects to make their shares more valuable.  For example, in late October 2004, Diller undertook a fax campaign to distribute a copy of a recent WebSky press release concerning a Wi-Max project in Argentina.  By December 2004, Diller began sending emails to investment managers and others asking them to invest in WebSky.  In December 2004, Crescent Fund entered into a consulting agreement with WebSky in which Crescent Fund would attempt to secure investments in WebSky in exchange for a ten percent "success fee" for any investments secured by Crescent Fund.

23.     In late 2004, Stone began laying the groundwork for a massive spam email campaign promoting WebSky.  In November 2004, Stone contacted a Florida stock promoter and asked him to conduct a public relations campaign for WebSky.  The promoter advised Stone that he could conduct a spam email campaign.  Stone agreed to pay the promoter 20 million WebSky shares for conducting the campaign.

24.     Although Diller, Pedracar and Stone had received all 287 million WebSky shares from WebSky, they had failed to pay WebSky for the majority of the shares by mid-January 2005.  In December 2004 and January 2005, Haffer informed Diller and Stone that the failure to pay for the shares was jeopardizing WebSky's business prospects and, in particular, that WebSky's joint venture to develop a Wi-Max system in Argentina was in jeopardy.

25.     Notwithstanding Haffer's statements to Stone concerning the difficulties WebSky faced in Argentina, Stone proceeded with his plan to distribute spam email that touted WebSky's business prospects.  In January 2005, an individual hired by the Florida stock promoter drafted a proposed email.  The text of the email repeated statements from an October 27, 2004 WebSky press release announcing a joint venture agreement to build a Wi-Max system in Argentina.

Specifically, the draft spam email repeated a statement from the October 2004 press release that WebSky anticipated annualized net revenues in the third year of the Argentina operations to exceed $40 million. However, because of Stone's failure to pay for the WebSky shares, the statements in the October 2004 press release concerning WebSky's prospects in Argentina had been rendered stale and false.

26.     On January 20, 2005, Stone forwarded the draft spam email discussing Argentina to Haffer and told him that Stone planned to disseminate it publicly. Haffer responded by email: "Will not sign off on this. Among other reasons, because of the failure to pay for stock purchase, Argentina deal is no longer viable." Despite knowledge of WebSky's financial problems and specific problems with the Argentina project and despite Haffer's explicit instructions not to disseminate the spam email, Diller authorized the Florida stock promoter to distribute the spam email.

27.     Based on Diller's approval of the campaign, the Florida stock promoter distributed the spam email on January 26 and 27, 2005. The spam email falsely stated that WebSky had a joint venture agreement for development of a Wi-Max system in Argentina that would result in annual revenues of over $40 million in the third year of operations. Based on Haffer's emails to Stone and Diller concerning WebSky's problems with its Argentina venture and based on Haffer's explicit order that Stone not distribute the email because the Argentina venture was "no longer viable," Stone and Diller knew or were reckless in not knowing of the falsity of their statements in the spam email.

28.     The email had an immediate and dramatic effect on the trading price and volume of WebSky stock. On January 25, 2006, the stock closed at $0.0021 per share. By January 27, 2005, however, the second trading day of the spam email campaign, the stock soared to $0.0069, an increase of over 200% over the January 25th close. Moreover, approximately 234 million

shares of WebSky stock were traded on January 27, 2005.  By contrast, in the period from January 3 to 25, 2005, an average of 12 million WebSky shares traded each day.

29.     From January 26 to the end of the following week, Crescent Fund, Pedracar and Diller sold over 98 million WebSky shares purchased through the Subscription Agreement for proceeds of approximately $575,000.

30.     Combining the sales during the spam email campaign, other open-market sales and direct sales to third parties, the Stone-related entities obtained proceeds of at least $1,064,362 on the sale of WebSky securities.

**Stone, Diller and Crescent Fund Operated as Unregistered Broker-Dealers**

31.     As described above, Stone, Diller and Crescent Fund each participated in the offer and sale of WebSky securities and obtained compensation for such activity.

32.     Stone, Diller and Crescent Fund did not register as a broker or dealer with the Commission.

33.     Stone, Diller and Crescent Fund operated as unregistered broker-dealers.

**WebSky and Haffer Violated the Registration Provisions of the Securities Act**

34.     Haffer learned in January 2005 that Diller had sold WebSky shares in contravention of Diller's assurances.  Nonetheless, in August 2005, Haffer returned to Stone and Diller for financing.  On August 14, 2005, WebSky executed a subscription agreement for the sale of 1.95 million WebSky shares for $195,000 to another Diller-controlled entity, Atticus Investments, LLC.  WebSky received $35,000 under that agreement.

35.     Haffer, as WebSky's CEO and President, participated in the offer and sale of WebSky securities to Atticus by, among other things, negotiating the offer and sale of the securities and directing WebSky's transfer agent to issue the securities to Atticus.  Atticus began selling the WebSky shares into the market almost immediately.

36.     No registration statement was filed with the Commission in connection with the offer and sale of any WebSky securities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Against Stone, Diller and Crescent Fund)**

**Violations of Exchange Act Section 10(b) and Rule 10b-5**

**[Fraud in Connection with the Purchase or Sale of Securities]**

37.     The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

38.     From September 2004 through February 2005, defendants Stone, Diller and Crescent Fund directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instruments of interstate commerce, or the mails, or a facility of any national securities exchange, with scienter:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

39.     Defendants Stone, Diller and Crescent Fund by such conduct, violated 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5 and, unless enjoined, will continue to engage in such violations.

**SECOND CLAIM FOR RELIEF**
**(Against Stone, Diller and Crescent Fund)**

**Violations of Securities Act Section 17(a)**

**[Fraud in Connection with the Offer or Sale of Securities]**

40.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

41.    In January and February 2005, defendants Stone, Diller and Crescent Fund, directly or indirectly, in the offer or sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce, and by use of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

42.    Defendants Stone, Diller and Crescent Fund by such conduct, violated 15 U.S.C. § 77q(a) and, unless enjoined, will continue to engage in such violations.

**THIRD CLAIM FOR RELIEF**
**(Against Stone, Diller and Crescent Fund)**

**Violations of Exchange Act Section 15(a)**

**[Operating as an Unregistered Broker or Dealer]**

43.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

44.    Defendants Stone, Diller and Crescent Fund, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, acted as a broker and/or dealer and/or effected transactions in, and induced or attempted to induce the purchase or sale of, securities (other than an exempted security or commercial paper,

bankers' acceptances or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

45.    Defendants Stone, Diller and Crescent Fund by such conduct, violated 15 U.S.C. § 78o(a) and, unless enjoined, will continue to engage in such violations.

**FOURTH CLAIM FOR RELIEF**
**(Against Stone)**

**Violations of Exchange Act Section 15(b)(6)(B)**

**[Violation of a Commission Order]**

46.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

47.    Defendant Stone became a broker-dealer and associated with Crescent Fund, a broker-dealer, in contravention of an order barring him from associating with any broker dealer without consent of the Commission.

48.    Defendant Stone, by such conduct, violated 15 U.S.C. § 78o(b)(6)(B) and, unless enjoined, will continue to engage in such violations.

**FIFTH CLAIM FOR RELIEF**
**(Against All Defendants)**

**Violations of Securities Act Sections 5(a) and 5(c)**

**[Offering or Selling Securities without a Registration Statement]**

49.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

50.    Sections 5(a) and 5(c) of the Securities Act prohibit the sale of any security unless a registration statement is in effect with regard to that security, absent an applicable exemption from that requirement [15 U.S.C. §§ 77e (a) & (c)].

51.    Defendants Stone, Diller, Crescent Fund, Pedracar, WebSky and Haffer, by engaging in the conduct set forth above, directly or indirectly, made use of the means or

instruments of transportation or communication in interstate commerce or of the mails, to offer and to sell securities when no registration statement had been filed or was in effect as to such securities and for which there was no exemption from registration.

52.     Defendants Stone, Diller, Crescent Fund, Pedracar, WebSky and Haffer, by such conduct, violated 15 U.S.C. §§ 77e(a) and 77e(c) and, unless enjoined, will continue to engage in such violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter orders:

### I.

Permanently restraining and enjoining each of the defendants from violating the provisions of the federal securities laws alleged against them in this Complaint.

### II.

Ordering all defendants to disgorge their ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

### III.

Ordering defendants Stone, Diller, Crescent Fund, Pedracar and Haffer to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

IV.

Granting such other and additional relief as this Court may determine to be just and proper.

Respectfully submitted,

Dated: August 17, 2006

Robert B. Blackburn (RB-1545)
Local Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center, Room 4300
New York, NY  10281-1022
E-mail:  BlackburnR@sec.gov
Phone:  (212) 336-1050
Fax:  (212) 336-1317

Xavier Carlos Vasquez (XV-5629)
Helane L. Morrison (not admitted in the S.D.N.Y.)
James A. Howell (not admitted in the S.D.N.Y.)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, 26th Floor
San Francisco, CA  94104
Phone:  (415) 705-2500
Fax:  (415) 705-2501
E-mail:  VasquezC@sec.gov