UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :
                                      :
              Plaintiff,              :
                                      :         06 Civ. 6258 (HB)
        - against -                   :
                                      :         **MEMORANDUM**
JEFFREY STEVEN STONE; JANETTE DILLER  :         **OPINION**
STONE; CRESCENT FUND, LLC; PEDRACAR,  :
INC.; WEBSKY, INC.; and DOUGLAS HAFFER,:
                                      :
              Defendants.             :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

The Securities and Exchange Commission (the "Commission" or "SEC") brought this action on August 27, 2006, charging Defendant Janette Diller Stone ("Diller Stone") and the other defendants with conducting a market manipulation scheme by which they purchased stock from WebSky, Inc. ("WebSky"), then disseminated false public information touting WebSky with the goal of dumping inflated WebSky stock on unsuspecting public investors, in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a), Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78o(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Without admitting or denying the Commission's allegations, Diller Stone consented to the entry of an Order of Permanent Injunction and Other Relief ("Consent Judgment"), enjoining her from future violations of those statutes. The Consent Judgment requires Diller Stone to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]." Diller Stone also agreed that "[t]he Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission or at trial."

The Consent Judgment precludes Diller Stone from "arguing that she did not violate the federal securities laws as alleged in the Complaint" and from challenging the validity of the Consent Judgment. The Consent Judgment provides that, for the purposes of the instant motion, "the allegations of the Complaint shall be accepted as and deemed true by the Court."

The Commission now moves for a determination of (1) disgorgement in the amount of $345,754.04; (2) prejudgment interest in the amounts of (a) $69,593.14, jointly and severally

with Defendants Pedracar, Inc. ("Pedracar"), Crescent Fund, LLC ("Crescent Fund") and Jeffrey Steven Stone ("Stone"), and (b) $46,900.03, jointly and severally with Stone only; and (3) a civil penalty of $60,000.00.  The Commission also moves to strike certain arguments and evidence by Diller Stone as inadmissible and beyond the scope of the Consent Judgment.

For the reasons set forth below, the Commission's motions are granted and, contemporaneously with this Opinion, the Court enters the attached Order Granting Plaintiff's Motion for Determination of Disgorgement, Prejudgment Interest and Penalty Amounts to be Paid by Defendant Janette Diller Stone and Final Judgment.

## I.  BACKGROUND

To the extent that the parties' agreement and the Consent Judgment require this Court to deem the factual allegations in the Complaint as true, "[t]he facts related to liability are essentially undisputed."  *See SEC v. Kane*, No. 97 Civ. 2931, 2003 WL 1741293, at *1 (Apr. 1, 2003).  On or about September 20, 2004, Pedracar, an entity controlled by Diller Stone, agreed to purchase 287,700,000 WebSky shares from WebSky for $719,250, or $0.0025 per share.  Diller Stone, as the president of Pedracar, signed a subscription agreement for the purchase.  (Compl. ¶ 16.)  In the subscription agreement, Diller Stone falsely represented to WebSky that Pedracar was an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act and that Pedracar was acquiring the shares for its own account and not on behalf of any other or with any view to distributing them.  Diller Stone repeatedly misled WebSky's president and CEO by telling him that Pedracar had no intention of selling the shares.  (*Id.* ¶ 17.)

Diller Stone's statements were false.  When Diller Stone signed the subscription agreement, she and Stone, who is now her husband, fully intended to distribute the WebSky shares, even though the federal securities laws barred them from doing so in the absence of a registered transaction or statutory exemption.  (*Id.* ¶ 18.)  Three days after she entered into the subscription agreement on behalf of Pedracar, Diller Stone, along with Stone, took steps to distribute the shares.  For example, she authorized the transfer of 14.5 million WebSky shares from Pedracar's brokerage account to a third party investment manager who purchased them for $100,000.  (*Id.* ¶ 19.)  In December 2004, Crescent Fund, of which Diller Stone was president, entered into an agreement to assume certain of Pedracar's payment obligations to WebSky under the subscription agreement; in exchange, Pedracar transferred its WebSky shares to Crescent Fund.  (Haffer Decl. ¶ 3, Ex. B.)  By January 2005, Pedracar and Crescent Fund had sold more than 101 million WebSky shares for $365,000 in proceeds to third parties, making a profit of

2

$110,855.  (Compl. ¶ 20.)  From late December 2004 through February 2005, Pedracar and Crescent Fund also began selling WebSky shares directly into the open market.  (*Id.* ¶ 21.)

Diller Stone and Stone promoted WebSky's prospects to make their shares more valuable.  For example, in late October 2004, Diller Stone undertook a fax campaign to distribute a copy of a recent WebSky press release concerning a Wi-Max project in Argentina, and by December 2004 she began sending emails to investment managers and others asking them to invest in WebSky.  In December 2004, Crescent Fund entered into a consulting agreement with WebSky in which Crescent Fund would attempt to secure investments in WebSky in exchange for a ten percent "success fee."  (*Id.* ¶ 22.)

Although Pedracar had received all 287 million shares from WebSky pursuant to the subscription agreement, by mid-January 2005 Diller Stone, Stone and Pedracar had failed to pay WebSky for most of the shares.  In December 2004 and January 2005, Defendant Douglas Haffer ("Haffer"), the president and CEO of WebSky, told Diller Stone and Stone that their failure to pay was jeopardizing WebSky's business prospects, especially WebSky's joint venture to develop a Wi-Max system in Argentina.  (*Id.* ¶ 24.)  Nevertheless, Stone proceeded with a plan to have a third party stock promoter distribute a spam email that touted WebSky's business prospects, including that WebSky planned to build a Wi-Max system in Argentina for which it anticipated annualized net revenues in the third year of operations to exceed $40 million.  (*Id.* ¶ 25.)  Despite her knowledge of WebSky's financial problems and specific problems with the Argentina project, and despite an explicit instruction from Haffer not to disseminate the spam email, Diller Stone authorized the stock promoter to distribute it.  (*Id.* ¶ 26.)

Based on Diller Stone's approval, the stock promoter distributed the spam email on January 26 and 27, 2005.  The email falsely stated that WebSky had a joint venture agreement for development of a Wi-Max system in Argentina that would result in annual revenues of over $40 million in the third year of operations.  (*Id.* ¶ 27.)  As a result, by the end of the second trading day of the spam email campaign, the trading price of WebSky's stock increased more than 200%, from $0.0021 per share at closing on January 25, 2005, to $0.0069 at closing on January 27, 2005.  (*Id.* ¶ 28.)  From January 26, 2005, to the end of the following week, Diller Stone, Crescent Fund and Pedracar sold more than 98 million WebSky shares, which had been purchased through the subscription agreement, for proceeds of approximately $575,000.  (*Id.* ¶ 29.)  In all, the Stone-related entities obtained proceeds exceeding $1 million on the sale of WebSky securities.  (*Id.* ¶ 30.)

## II. DISCUSSION

### A.  Disgorgement

Since Diller Stone has agreed that the allegations in the Commission's Complaint are deemed to be true, there can be no doubt that Diller Stone committed securities fraud.  She employed a device, scheme or artifice to defraud in the offer or sale of securities or in connection with any purchase or sale of securities in interstate commerce, 15 U.S.C. § 78j(b), and used untrue statements of material fact or omissions of material facts to effect securities transactions, 15 U.S.C. §§ 77q(a)(2), 78j(b).  She participated in a "pump-and-dump" scheme, a "stock-market manipulation scheme in which the schemers [first] artificially inflate, or 'pump,' the price of [a] stock by bribing stock promoters to sell it, and [then] 'dump' the stock once the price [becomes] sufficiently high."  *See United States v. Downing*, 297 F.3d 52, 55 (2d Cir. 2002) (internal quotation marks and citation omitted) (alterations in original).  She offered and sold securities in interstate commerce without a registration statement having been filed with the Commission, in violation of 15 U.S.C. § 77e(a), and, acting as a broker, used an instrumentality of interstate commerce to effect a transaction in a security, even though she was not registered as a broker or dealer with the Commission, in violation of 15 U.S.C. § 78o(a)(1).

Disgorgement serves the purpose of depriving the wrongdoer of ill-gotten gains and thus deterring violations of law.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).  Here, Diller Stone obtained ill-gotten gains and has agreed to disgorge them as ordered by this Court.  The Commission has shown, and Diller Stone does not dispute, that Diller Stone and her affiliates received a total of $1,069,568.19 from the sale of 259.9 million shares of WebSky stock.  (Diller Stone Decl. ¶ 9.)  Diller Stone and the Commission disagree, however, as to the amount that should be deducted from this total in order to calculate Defendants' net profit.

#### 1.  *Commission's Calculation of Net Profit Is Correct*

The district court has broad discretion in calculating the amount to be disgorged, which "need only be a reasonable approximation of profits causally connected to the violation."  *First Jersey*, 101 F.3d at 1475.  "Any risk of uncertainty in calculating the disgorgement amount should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Id.* (brackets and quotes omitted).

To calculate net profit, the $1,069,568.19 of proceeds from Defendants' sale of WebSky must be reduced by the amount of Defendants' payments to WebSky for the shares.  WebSky's

financial records show that Pedracar and Crescent Fund paid WebSky a total of $586,830 for the WebSky shares that Pedracar received under the subscription agreement. (Haffer Decl. ¶ 4, Ex. C.) The Commission contends, therefore, that Defendants' net profit was $482,738.19 (*i.e.*, $1,069,568.19 less $586,830). Indeed, on March 27, 2007, this Court entered a final judgment as to Defendants Pedracar and Crescent Fund ("Final Judgment"), which ordered them to jointly and severally disgorge this amount ($482,738.19), plus interest.

However, Diller Stone argues that $812,982.44 should be deducted from Defendants' proceeds and thus net profit is only $256,585.75.[1] (Diller Stone Decl. ¶ 8.) "Once the SEC has shown the existence of a fraudulent scheme . . . , defendant bears the burden of demonstrating that he received less than the full amount allegedly misappropriated and sought to be disgorged." *S.E.C. v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987). Diller Stone has failed to meet her burden.

First, Diller Stone claims that WebSky's financial records fail to include five wire transfers made by Crescent Fund to WebSky between October 18, 2004 and April 6, 2005, totaling $31,450.25. (Diller Stone Decl. ¶ 5(a), Ex. A.) However, the records of Crescent Fund's small business checking account do not indicate the recipient of these wire transfers. (*See id.* Ex. A.) There is no evidence that WebSky was the recipient of these wire transfers, nor did Diller Stone or Stone produce such evidence in response to the Commission's document requests or investigatory subpoena. (*See* Brooks Supp. Decl. ¶ 2.) Diller Stone's first argument is therefore unsubstantiated.

Second, Diller Stone argues that, from the proceeds of WebSky stock sales, Pedracar remitted $63,137.19 to Charles Frewen ("Frewen"), who was both a director of WebSky and a fifty-percent owner of Pedracar, and that this amount should be deducted from Defendants' profits. (*See* Diller Stone Decl. ¶ 5(b), Ex. B.) Payments by Pedracar to Frewen, however, are irrelevant, as general business expenses may not be subtracted from the disgorgement amount, and it does not matter how a defendant chooses to spend his ill-gotten gains. *See, e.g.*, *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602, at *3 (S.D.N.Y. Oct. 29, 2002); *SEC v. Bocchino*, No. 98 Civ. 7525, 2002 WL 31528472, at *2 (S.D.N.Y. Nov. 8, 2002).

Third, Diller Stone argues that a wire transfer dated February 10, 2005, in the amount of $51,565 from Pedracar to WebSky should have been included in WebSky's financial documents.

---

[1] Some of the basic calculations in Diller Stone's Declaration are inaccurate by a *de minimis* amount, *e.g.*, $10 or $18. The amounts here reflect accurate calculations based on the documentary evidence.

(Diller Stone Decl. ¶ 5(c), Ex. C.)  However, like the records for Crescent Fund, the small business checking account records for Pedracar do not indicate the recipient of the wire transfer, nor did Diller Stone or Stone produce such evidence in response to the Commission's document requests or investigatory subpoena.  (*See id.*; Brooks Supp. Decl. ¶ 2.)  Therefore, there is no evidence to substantiate Diller Stone's assertion.

Fourth, Diller Stone claims that to fund WebSky, Pedracar borrowed $150,000 from Steven J. Bodnar ("Bodnar") and that Pedracar repaid the loan, plus $5,000 of interest and late fees, out of the proceeds of WebSky stock sales.  (Diller Stone Decl. ¶ 5(d), Ex. D.)  Diller Stone points to a spreadsheet created by Pedracar that indicates that Bodnar made a wire transfer of $50,000 to WebSky, and argues that she should be credited with both this $50,000 payment by Bodnar and the $5,000 of interest and late fees that Pedracar paid to Bodnar.  (*See id.* Ex. D.)  However, as with the payments to Frewen, funds used for general business expenses should not be deducted from the disgorgement amount, nor would it be appropriate to deduct the amount that a nonparty, Bodnar, paid to WebSky.

Fifth, Diller Stone argues that the disgorgement amount should be reduced by an October 25, 2005 payment to WebSky in the amount of $10,000 made by nonparty Atticus, LLC, an affiliate of the Diller Stone-related entities.  (*Id.* Ex. E.)  However, this payment is irrelevant, as it is not appropriate to deduct payments by nonparties to WebSky.

Finally, Diller Stone argues that, at Haffer's request, her son developed WebSky's website, for which WebSky agreed to pay $15,000, and that the payment was paid by her or one of her affiliated entities, on WebSky's behalf, out of the proceeds from WebSky stock sales.  She argues that this sum of $15,000 should be credited as a payment to WebSky.  (*Id.* ¶ 7.)  Diller Stone, however, provides no documentary evidence to substantiate her claim, and even if she could, the claim is irrelevant because such a payment represents a business transaction between WebSky and a third party contractor, which has nothing to do with Pedracar's stock purchase.  As explained above, it does not matter how a defendant chooses to spend his ill-gotten gains.

Therefore, Diller Stone cannot substantiate her assertion that net profit is only $256,585.75, and this Court affirms the Commission's calculation of net profit at $482,738.19.[2]

---

[2] Moreover, Exhibits A, B, D and E attached to Diller Stone's Declaration must be stricken because they were never produced to the Commission, either in Diller Stone's Fed. R. Civ. P. 26(a) disclosures or in response to document requests served by the Commission.  (*See* Brooks Supp. Decl. ¶¶ 2-3.)  For similar reasons, the spreadsheet attached as Exhibits C and D of her Declaration must be stricken as an impermissible summary under Fed. R. Evid. 1006.  Finally, paragraphs 5(a)-(e), 6, 7, 8 and 9 of the Diller

### 2. *Credit for Amount Liquidated from Crescent Fund's Account*

The Commission requests that Diller Stone disgorge a total amount of $345,754.04, which represents net profit of $482,738.19 reduced by the amount liquidated from Crescent Fund's account with Charles Schwab & Co., Inc. ("Charles Schwab Account"). Diller Stone argues that a higher amount should be credited against net profit, resulting in a lower disgorgement amount.

On May 1, 2008, pursuant to the Court's April 22, 2008 Order, the Charles Schwab Account was liquidated and the Commission received a check in the amount of $136,984.15, in partial satisfaction of the Final Judgment. However, the Commission had sought and obtained an order attaching and freezing the Charles Schwab Account much earlier, on June 27, 2007. At that time, the Charles Schwab Account had a much higher value of $265,760. (Diller Stone Decl. ¶ 11, Ex. F.) The Commission did not seek an order to liquidate the account until nearly nine months later, on March 12, 2008, and by the time the account was liquidated, it contained only $136,984.15 due to decreases in the value of its investments. (*Id.* Ex. G.) Diller Stone argues that the Commission's delay in seeking liquidation should not prejudice her and that her disgorgement should be offset by the account's higher value at the end of June 2007.

Diller Stone's argument fails to convince this Court. That the assets in the Charles Schwab Account declined in value during the interval between the freezing and attachment order and the liquidation order does not change the fact that only $136,984.15 has been disgorged. Further, as the Commission points out, it has no obligation to apply the entire liquidated amount against Diller Stone's disgorgement; for example, the Commission could have applied the liquidated amount to pay down the prejudgment interest owed by Crescent Fund.

Therefore, the total disgorgement that Diller Stone must pay is $345,754.04.

### B. Prejudgment Interest

Prejudgment interest serves the goal of depriving a defendant of her ill-gotten gains. *First Jersey*, 101 F.3d at 1477. "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Roor*, No. 99 Civ. 3372, 2004 WL 1933578, at *10 (S.D.N.Y. Aug. 30, 2004) (quoting *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Diller Stone has agreed to pay prejudgment interest in an amount to be determined by this Court. Her sole argument, that she

---

Stone Declaration must be stricken because they cite and rely on such exhibits. Plaintiff's motion to strike these statements and exhibits, therefore, is granted.

was not a "principal party" in the wrongful conduct, runs afoul of the Consent Judgment and is belied by the facts, as described *supra*. Therefore, Diller Stone must pay the prejudgment interest calculated by the Commission, in the amounts of $69,593.14, jointly and severally with Pedracar, Crescent Fund and Stone, and $46,900.03, jointly and severally with Stone only.[3]

### C. Joint and Several Liability

Where two or more individuals or entities collaborated in the violations of the securities laws, the court has discretion to hold them jointly and severally liable for the disgorgement of illegally obtained proceeds. *See First Jersey*, 101 F.3d at 1475-76. Nevertheless, Diller Stone argues that she should not be held jointly and severally liable with Stone, Pedracar and Crescent Fund because she claims that she did not play a lead role in any of the alleged wrongdoing and that the SEC is seeking to punish her for her husband's conduct. (Diller Stone Decl. ¶ 13.) This could not be farther from the truth, based on the factual allegations of the Complaint.[4]

In addition to the facts outlined *supra*, Diller Stone's deposition testimony establishes that she was intimately involved in the securities violations perpetrated here. For example, she was the president and fifty-percent owner of Pedracar. (Diller Stone Dep. 30:20-21, Nov. 1-2, 2007, at Anderson Decl. Ex. 2.) She formed Crescent Fund, of which she was both the president and the CEO. (*Id.* 44:9-10, 77:5-7.) She testified that Stone was neither a managing director of Pedracar, "affiliated at all like that" with Pedracar, nor an independent contractor of Pedracar. (*Id.* 261:15-21.) She could not recall any occasion on which Stone placed an order to sell WebSky shares in any of the brokerages in which Pedracar held an account. She was the one who submitted written orders to those brokerage firms. (*Id.* 357:12-24, 358:20-24.) For these reasons and the factual background described *supra*, joint and several liability is appropriate.

### D. Civil Penalty

The Consent Judgment requires this Court to determine the amount of a civil penalty assessed against Diller Stone. A civil penalty serves the "dual goals of punishment of the individual violator and deterrence of future violations." *Kane*, 2003 WL 1741293, at *2 (citation

---

[3] From March 1, 2005, the first day of the month following Diller Stone and Stone's last sales transaction, to April 22, 2008, the date on which this Court's liquidation order was entered, interest is calculated based on the total disgorgement amount during that time of $482,738.19. Then, from April 22, 2008 to August 1, 2008, the date of the Commission's instant application, interest is calculated based on the total disgorgement amount of $345,754.04, which represents an offset of $136,984.15 liquidated from Crescent Fund's Charles Schwab Account. (Brooks Decl. ¶ 38.)

[4] Paragraphs 2-3 and 13-16 of Diller Stone's Declaration must be stricken because they contain statements that are contrary to the Complaint. Plaintiff's motion to strike these statements is granted.

omitted).  The Commission seeks the imposition of a civil penalty in the amount of $60,000 pursuant to Section 20(d)(2)(B) of the Securities Act, 15 U.S.C. § 77t(d)(2)(B), and Section 21(d)(3)(B)(ii) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(ii).  These sections of the securities laws set forth three tiers of penalties, depending on the severity of the infraction.  The Commission's requested penalty of $60,000 is the maximum amount permitted in the second tier, which applies to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."[5]  15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).

However, the civil penalty framework is of a "discretionary nature," and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed."  *Moran,* 944 F. Supp. at 296-97.  In determining the amount of the fine,

> courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

Here, Diller Stone's involvement in the pump-and-dump scheme, as described *supra*, demonstrates "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," which triggers a second-tier penalty under the securities laws.  As just one example, Diller Stone, as president of Pedracar, signed the subscription agreement with WebSky for the purchase WebSky shares, promising not to distribute the shares in violation of the securities laws, then proceeded shortly thereafter to market and sell the shares.  Diller Stone's conduct was egregious, and she displayed a high degree of scienter.  She authorized the spam email that contained material misrepresentations in order to tout WebSky's stock, which resulted in a dramatic upswing in WebSky's stock price and thus created a high risk of loss to investors who bought the stock in reliance on such fraud.  Diller Stone's conduct was recurrent, as she participated in numerous misrepresentations and securities violations throughout her relationship with WebSky.  Finally, Diller Stone has not submitted any evidence that her current or future financial condition favors a reduction of the civil penalty.

A civil penalty seems advisable to deter Diller Stone from committing future securities

---

[5] In 2001 the maximum civil penalty in the second tier was increased from $50,000 to $60,000.  *See* 17 C.F.R. § 201.1002.  The second tier also authorizes a civil penalty up to the amount of the defendant's pecuniary gain as a result of the violation, even if this amount exceeds $60,000.

violations. Diller Stone is currently employed by the Wakabayashi Fund in Japan, a hedge fund that invests in real estate deals and that, according to Diller Stone, markets primarily to Japanese and other Asian companies. (Diller Stone Dep. 37:22-28:8.) While Diller Stone attempted to downplay her involvement by stating that she is only a member of the company and her uncle is the owner, (*id.* 38:11-12), the Wakabayashi Fund's promotional materials reveal that Diller Stone is the "CEO, Director and Co-Founder," and her biography is listed first and is the longest.[6] (Brooks Decl. Ex. 27.) Diller Stone trades stock for the fund. (Diller Stone Dep. 38:20-25.) Further, this Court is wary of the fact that two consulting agreements dated October 18, 2007, between Wakabayashi Fund and a third party are purportedly signed by Diller Stone's son as the fund's "President." (Brooks Decl. ¶ 43.) Her son was a nineteen-year-old college student in the United States at that time. (Diller Stone Dep. 13:4-10.)

Finally, Diller Stone has failed to demonstrate any significant cooperation with the Commission's investigation that could militate in favor of a lower civil penalty. Although Diller Stone did travel from Japan to the United States for her deposition, she has failed to provide the Commission with all relevant documents. For example, she promised to produce the supporting documents for a spreadsheet upon which she relied during her deposition and to make herself available for questioning on those documents, but she never did so. (*See* Anderson Supp. Decl. ¶¶ 5-6, Ex. C; Diller Stone Dep. 562:21, 563:14-25, 564:8-16.)

Therefore, a civil penalty of $60,000 is appropriate.

## IV. CONCLUSION

For the foregoing reasons, this Court enters the attached Order Granting Plaintiff's Motion for Determination of Disgorgement, Prejudgment Interest and Penalty Amounts to be Paid by Defendant Janette Diller Stone and Final Judgment.

**IT IS SO ORDERED.**
New York, New York
January 13, 2009

_____
U.S.D.J.

---

[6] *See* Wakabayashi Fund website at *http://www.wakabayashifund.com/wfllc_Overview.pdf*.